## Land Title Bank & Trust Co., Trustee, v. Robinson et al.

*Thomas Burns Drum* and *Charles I. Thompson* of *Ballard, Spahr, Andrews & Ingersoll,* for accountant.

*Robert T. McCracken, John Randolph Young* and *Andrew R. McCown* of *Shields, Clark, Brown & McCown,* and *Sundheim, Folz & Sundheim,* for exceptants.

FINLETTER, P. J., August 9, 1938.—Three funds are before us for distribution. They are the products of foreclosure sales of properties subject to the lien of mortgages given as security for issues of bonds. The sales have been confirmed, subject to the decision of the court upon the various questions of distribution hereinafter discussed.

1. The first question is whether or not bonds held by one who has guaranteed the payment of the principal and interest of the whole issue, shall be subordinated to the other bonds.

There can be no question on this subject in Pennsylvania, since the decision in Worrall's Appeal, 41 Pa. 524, wherein the rule of Donley et al. v. Hays, 17 S. & R. 400,

was held not to apply to guaranteed interests, and Himes v. Barnitz, 8 Watts 39, decisions which were followed, from Appeal of Fourth National Bank et al., 123 Pa. 473, 486, to North City Trust Company Case, 327 Pa. 356 (1937), and Agricultural Trust & Saving Company's Mortgage Pool Case, 329 Pa. 581.

This is the rule also of the New York cases, and it is followed in other States. The only exception to which our attention has been called is the New Jersey case which we refer to below.

The New York cases consider, besides the general rule, various refinements of the question, arising out of the form of the guaranty, holding in some cases that there was subordination, and in others that there was not, depending upon the particular phraseology used. These do not concern us in the instant case, since all unite in the general proposition that bonds held by a surety or guarantor are subordinated to those guaranteed, unless there is an "unmistakable" intention shown to the contrary.

See the following cases arising out of the failure of the Lawyers Title & Guaranty Company: 157 Misc. 516, 164 Misc. 292, 165 Misc. 590 (1 N. Y. Supp. (2d) 264). See also In re Title & Mortgage Guaranty Co. of Sullivan County, 275 N. Y. 347, In re New York Title & Mortgage Co., 157 Misc. 271, and Louisville Title Company's Receiver et al. v. Crab Orchard Banking Co. et al., 249 Ky. 736, 739 (which cites appeals of Fourth National Bank et al., supra), and Reconstruction Finance Corp. v. Smith (Court of Civil Appeals, Tex., 1936), 96 S. W. (2d) 824.

In New Jersey a rule to the contrary is stated in Kelly, Commr. etc., v. Middlesex Title Guarantee & Trust Co. et al., 115 N. J. Eq. 592. Apparently the learned writer of the opinion was influenced by the thought that the only equity to be considered was the avoidance of circuity of action. We agree that the mere convenience of practice should not alter substantive rights. But there exists a more substantial equity, which is ignored in the New

Jersey case, which is that the guarantor's rights in the mortgaged property are subject to the limitation of his contract of guaranty. He can, in equity and good conscience, make no claim against a fund to which he has guaranteed the rights of others, which will violate this guaranty.

The rule then is that in the absence of an express intention to the contrary, where the assignor of part of a mortgage debt himself guarantees payment of it, thereby giving rise to a special equity to his assignee, the rights of the assignor to participate in the distribution of the mortgage security will be subordinated to rights of his assignees.

In the instant case there is no intention expressed in the mortgage to take the case out of the general rule—certainly no such "unmistakable" expression as is required under the New York rule.

The following clauses have been pointed out in this connection by counsel, as negativing the intention to subordinate: "This bond is one of an issue of 360 bonds . . . each equally entitled to the security to be derived from a certain mortgage."

Also the provision that, on foreclosure the trustee shall act "for the equal benefit of all holders of bonds"; and the habendum clause that the premises "shall be held . . . for the equal use . . . of holders of bonds without discrimination or priority in the issue or negotiation thereof or otherwise". Also the clause providing for distribution on foreclosure to outstanding bonds in full or, if the fund is insufficient, then pro rata without preference of interest over principal, etc. Also the clause which treats of the trustee's right to take possession on default. As counsel says: "The mortgage quite clearly requires the premises to be held for the equal protection of all bonds, and that the proceeds are to be distributed pro rata." So it does in the ordinary course of events which are ruled by the mortgage alone, but not where the parties' rights

depend upon another contract, as well as upon the mortgage.

We can read in the clauses above recited no intention to vary the rule that a guaranty must be given its effect.

Counsel for the Mortgage Service Company argues that inequitable results will follow from the application of the rule, in a given case, and also comparing the many cases of guaranteed series issued by the Philadelphia Company. He says, for example, in the Oak Lane Towers case, holders who agreed to receive 1/3600 of the security for each $500 bond, will be given a larger percentage of the security if $13,500 of the bonds are stricken down. But even so, they will not receive the full $500, which the holder of the subordinated bonds covenanted to secure to them. The difference results from the guaranty, under which one party was entitled to the benefit, and the other bears the burden. Comparatively, among the many guaranteed issues pending on our docket, it is argued that there will be a difference in the percentage of recovery among different bond issues, depending on the proportion of subordinated bonds in each issue. This may be so, but each issue stands on its own facts. No doubt there will be a variation arising out of the difference in values of the different premises.

It is too late, however, to attempt to change the rule, so long established, and so recently followed in this State, and we may add, so generally recognized in other jurisdictions.

2. In many instances bonds were repurchased by the issuing company, and of them many were resold, and some retained by the company. No question has been raised concerning these transactions, and none could be: McClelland and Fisher on Law of Corporate Mortgage Bond Issues, p. 421.

3. Some of the repurchased bonds were subsequently pledged by the company for value. Pledgees for value have the same status (to the extent of the pledge) as

purchasers: 49 C. J. 927, sec. 64; In re Lawyers Title & Guaranty Co., supra.

4. The guaranty of which we have spoken is as follows: "The Philadelphia Company guarantees to the registered holder . . . payment of interest together with the principal as soon as collected but in any event within eighteen months after the same shall have become due."

In one instance the Pennsylvania Company made a large loan to the Philadelphia Company and received, as collateral, bonds whose due dates had already passed, but as to which there had been no breach of the contract of guaranty, that is, the bonds were accepted as security during the 18-months' period.

Counsel for some bondholders argues that the pledgee is subordinated as to those bonds by the fact that the due date of the bonds had passed, or, as he expresses it, "the bonds had matured", and defenses and equities have, he says, arisen, for the benefit of bondholders against the pledgee.

We do not agree, for one reason, because no new equities had arisen, and, again, counsel is misled by the seeming analogy of a negotiable instrument.

The acquirer of a matured note takes an infirm instrument subject from the date of maturity to defenses. The whole character of the instrument changes on the given date. It loses its original negotiability and becomes nonnegotiable. From being sound it becomes infirm.

There is no pertinent analogy between a negotiable note and a bond. The bond is nonnegotiable from the moment the seal is attached, that is from its creation. In the instant case the bonds are registered, and required so to be by the mortgage, and therefore nonnegotiable: Novoprutsky v. The Morris Plan Co. of Phila., 319 Pa. 97. Nothing happens when the due date arrives. The bond remains as it was—nonnegotiable. It may be that new rights may arise later, and we think they do, when there is a breach of the guaranty contract, but we are not yet speaking of this, but only of the effect of the so-called

"maturity" of the bond. Default in the mortgage alone brings about only a pro rata distribution: Donley et al. v. Hays, supra. It is the effective guaranty that produces subordination.

Again these are mortgage bonds secured on real estate. In actual commercial practice and in treatment of the two kinds of instruments there is a vast difference. Non-payment of a note on the due date is a breach of all commercial standards. It indicates weakness of security, possibly insolvency. An overdue mortgage bond indicates commercially the very reverse, that is, that the investor is satisfied with his security and is willing it should stand. Its legal status is exactly what it was the day before the end of the term of the mortgage. It was and remains nonnegotiable, and always was from its creation. No new equity attaches from the mere fact of "maturity", and it still has the security of the real estate on which it is a lien, and the personal liability of the mortgagor.

We have said that no new equity attaches—we mean none attaches from the mere passage of the date. New equities can arise after the date. These of course would attach when they arise, not from the passage of the due date, but from other facts and because of the always existing status of the bond as a nonnegotiable instrument.

In the instant case such a new equity could arise, and did in some cases, but not, however, in those now before us. For example, in First Mortgage Corp. of Phila. v. Integrity Trust Co., 33 D. & C. 484, where the bonds had been accepted in pledge after the breach or term of the contract of guaranty, as well as after the bond due date, such bonds were taken by the pledgee when they were already subject to subordination.

That is not the case before us. There was no default on the guaranty contract. The guarantor was not yet liable on it. There was ample time for him to perform his guaranty if the mortgagor should continue in default, or for the latter to clear the default. Either event would save

the bond held by the guarantor from subordination, and the pledgee had a right to assume the guarantor would perform the contract. We must deal with the transaction as of the date it took place. The pledgee's bonds were then good unless the assignor was at that time indebted upon them for the benefit of the other bondholders. He was not, and would not be for over a year.

In our opinion, bonds that have been purchased back by the guarantor, and later resold, before or after the due date of the bond, but before a breach of the contract of guaranty, are good in the hands of a purchaser or pledgee for value. It is only bonds originally issued and later repurchased, and held by the guarantor at the date of the breach of guaranty, that are subordinated in its hands or in the hands of an assignee who took from it after the breach of the guaranty.

We are therefore of opinion that the pledgee's bonds were good in the hands of the pledgee, and should not be subordinated.

Coming to each case separately:

### Oak Lane Towers

On May 15, 1929, Robert A. Robinson executed a mortgage whereby he conveyed to the Philadelphia Company for Guaranteeing Mortgages, hereinafter referred to as the Philadelphia Company, as trustee, the Oak Lane Towers property, to secure an issue of 360 bonds of a total face value of $180,000. All bonds were registered, and were required to be kept registered. They were all guaranteed by the Philadelphia Company in the terms set forth above. Their maturity date was May 15, 1932. They were all bought by the Philadelphia Company and later sold to various purchasers.

The Philadelphia Company subsequently repurchased $42,500 of them and later resold $29,000 worth of those repurchased.

Before the maturity date, that is, on October 1, 1931, the Philadelphia Company pledged $12,500 of them with

the Pennsylvania Company for Insurances on Lives, etc., as part of the collateral for a loan of $500,000. The loan is still unpaid and the pledged collateral is worth much less than the amount of the loan.

There remain in the hands of the Philadelphia Company, or rather of its assignee, for the benefit of its general creditors, the Mortgage Service Company, two bonds of the aggregate face value of $1,000.

The Pennsylvania Company, as pledgee for value, is (to the extent of its pledge) precisely in the same equitable position as a purchaser for value. Its status therefore must be recognized as that of a purchaser for value of the $12,500 of bonds. These bonds are not subordinated.

The Mortgage Service Company, which holds as trustee for the Philadelphia Company, cannot participate in the distribution until the guaranty is satisfied. (See our discussion of the effect of the guaranty supra.) The $1,000 held by that company is subordinated to the other bonds of the issue.

There is another claim made by the Mortgage Service Company as assignee of the Philadelphia Company. The facts in this connection are that on November 15, 1932, the Philadelphia Company "advanced" to bondholders $3,538.17, being an instalment of interest due on the mortgage and payable by the Philadelphia Company under the guaranty. This was not an "advance". It was a payment of a sum due by the guarantor, in other words, a performance of its contract. We can see no reason for repaying the guarantor.

### Aquila Apartments

On May 15, 1925, Julius Schenck et al. executed a mortgage whereby they conveyed to the Philadelphia Company property known as Aquila Apartments, to secure an issue of 200 bonds of the aggregate face value of $100,000. All the bonds were registered. All were guaranteed by the Philadelphia Company in the terms set

forth above. The maturity date of the bonds was May 15, 1928, but it was by agreement extended to May 15, 1931. The Philadelphia Company bought all the bonds and sold them to various purchasers.

Prior to May 15, 1928, $10,000 of the bonds were canceled and $45,000 were repurchased by the Philadelphia Company. Of the repurchased bonds, $20,000 were resold between January 27, 1927, and June 14, 1930, that is, before maturity. Of the bonds repurchased, but not resold, on December 1, 1931, that is, after the extended due date of the bonds, but before the 18-months' period had expired, $10,000 in face value was pledged with the Pennsylvania Company for Insurances, etc., as collateral for a loan of that amount. Other repurchased bonds to the amount of $10,000 were, after maturity, but also before the expiration of the 18-months' period, pledged to the Land Title Company as part collateral for a loan of $967,000. Neither of the parcels of bonds last referred to is subordinated.

The loans have not been paid, and the bonds are now held by the Mortgage Service Company subject to the pledges.

The remaining $5,000 are subordinated in the hands of the Mortgage Service Company, Trustee. (See our discussion, supra.)

### *Wynnefield Apartments*

On November 2, 1925, Harry R. Strauss executed a mortgage to the Philadelphia Company, secured on a property known as Wynnefield Apartments, to secure an issue of $150,000 worth of bonds, maturing in six annual series—five of $5,000 each, and a final one of $125,000, the due dates being November 2, 1930 to 1934, for the first five, and November 2, 1935, for the sixth series. The bonds were not bought by the Philadelphia Company, but all were guaranteed as they were sold. The guaranty was, inter alia, as follows:

"Payment of the principal and of every instalment thereof, as soon as collected but in any event within 18 months after the same shall become due under the terms of the bond, or if with the written consent of the guarantor, payment be not demanded when due, then within 18 months after it shall have been demanded by the insured".

As to certain bonds there was an addition to the guaranty which is not pertinent to the present issues. All the bonds were registered.

The Philadelphia Company repurchased $40,000 of the bonds, and resold $30,000 of those repurchased. Of the $10,000 remaining in the hands of the Philadelphia Company, the Philadelphia Company, on March 21, 1932, pledged Series A and B, total $10,000, to the Land Title Company, as part collateral for a loan of $967,000 and one of $480,000. The due dates of these pledged bonds were November 2, 1930, and November 2, 1931. That is, they were pledged after maturity but before the expiration of the 18-months' period of the guaranty. The loans are unpaid and the collateral worth less than the loan. The mortgage is in default as to principal and otherwise.

In our opinion the pledged bonds are not subordinated.

Between May 2, 1931, and August 7, 1931, the Philadelphia Company paid bondholders interest due on the mortgage in the sum of $14,964.52. In doing so it did nothing but what was required by the guaranty contract, and can claim nothing on that account.

For the reasons we have given above the exceptions of the Mortgage Service Company, in re Oak Lane Towers, are dismissed.

The exceptions of James J. Collins are sustained to the extent that the $1,000 of the bonds referred to, which are held by the Mortgage Service Company, are subordinated to the other bonds of the issue.

The exception of Oak Lane Towers Apartments, Inc., and Milton Apfelbaum is dismissed, insofar as it relates

to the pledge of 25 bonds (being those numbered 285 to 309, incl.). The exception is otherwise sustained.

The exception, in re Aquila Apartments, Inc., of the Mortgage Service Company is dismissed.

The exception of Aquila Apartments, Inc., and Newton H. Jones is dismissed, insofar as it relates to the two pledges of $10,000 each, and sustained as to $5,000 of bonds held by Mortgage Service Company. These are subordinated to other bonds of that issue.

The exceptions, in re Wynnefield Apartments, of the Mortgage Service Company are dismissed.

The exceptions of the Wynnefield Apartments and Newton H. Jones are dismissed.